All right, my name is Rob Stevens from Billings, Montana. I'm appearing on behalf of the appellant and defendant below, Brian Barker. And may it please the Court and the counsel for the government, I will make my brief presentation, just that, brief and short. I believe that the most dispositive and single issue that the Court should address is the appropriateness of specific performance for the breach of the government's plea agreement. I believe that this Court reviews a breach of plea agreement and the mixed questions of law and fact de novo. I am asking that the Court apply the undisputed material facts established in this case and the clear, precise statements of law that are applicable and remand to the district court after vacating the sentence and judgment with instructions to dismiss the indictment with prejudice. Now, you may well ask, what are those material undisputed facts and clear statements of law that justify that request for relief? Applying the Clark decision to the issue of breach of plea agreement, we know there was a completed investigation. We know there was an ongoing single course of conduct that extended from December of 2002 until Brian's arrest in July of 2003. We know that his objective, reasonable expectations were disappointed. It was an objective, reasonable expectation that the nonprosecution agreement that said we're not going to prosecute you for any of the occurrences or acts arising out of this indictment in Missoula meant what it said. And it covered a period of time from roughly December of 2002, January of 2003, up until the date of that indictment in May of 2003. I know that the two counts, I guess it was counts 2 and 3 in the Missoula indictment were very specific, and they were in Great Falls and Missoula County on specific dates. And so it's really only the count 1 which has allegations that are broader. And it includes Missoula, Great Falls, Billings, and elsewhere. And it has a time period, December 2002 to March 2003. The only possible overlap with the Billings indictment would be with respect to the statements in count 1. And in looking at what the district court had findings that, or indicated it's crediting the AUSA that the Billings indictment was only as to the Pitch matter, where was the overlap? Why was the district court erroneous in making that conclusion? Well, the overlap was because Pitch had been an established Billings customer since January and February of 2003, which is the same period of time that's covered in the Missoula indictment. And the testimony was undisputed that Pitch received illegal drugs from Bryan over that entire period of time. And there was no difference in the modus operandi, there was no difference in the type of drugs, there was no difference in the charges that were being made. And the, even though the Missoula conspiracy count was dismissed, it clearly contemplated that series or course of conduct. Now, how could that be, given that the Missoula indictment was issued, I guess, before there was the arrest of Mr. Barker with respect to the Pitch transaction in, I don't know how to pronounce it, B-U-T-T-E. Is that? Okay. The question, Your Honor, I think can be answered this way. July 23rd, 2003, they caught up with him. The investigation that resulted in his arrest was a joint investigation from the Central Montana Task Force, the CID, and the HDATK, whatever it was. DEA agent heard from Billings' liaison for all of those. They developed Barker information in Billings in January and February of 2003, which was presented to the Missoula grand jury, then re-presented to the Billings grand jury. The overlap is the conduct, and the overlap is the issue that when Brian pled guilty in October of 2003, he knew about the Billings transactions. He knew, the government knew, and the government agreed that if he pled guilty up in Missoula, he wouldn't get charged with the rest of that. Now, what's in the record that shows that the government was in contemplation of the course of conduct that ended with the Pitch transaction? What is in the record that says what, Your Honor? Because the AUSA at the, before the district court said, no, the Billings case is only about Pitch, it doesn't relate to the Pitch transaction, it doesn't relate to the Missoula. It belies the record that was made in Missoula sentencing before Judge Malloy, because the assistant U.S. attorney, the same assistant U.S. attorney here, cross-examined Brian about transactions, drug transactions in Billings, and he did it in several places. Brian testified that he, regarding these ongoing transactions, Judge Malloy, when he departed, when he sentenced at the high end of the guidelines up there, did so in spite of the plea agreement that the government represented at the low end, and he did so because he took cognizance of Brian's testimony and the other testimony about this extensive course of conduct, which ended with his arrest on July 23rd, 2003. Now, did they specifically mention the Pitch matter as allied conduct, or? Here's what we have for the Pitch transaction. We have a connection of another informant and another individual involved with Pitch by the name of Tasha Carter, and those transactions between Pitch and Carter occurred initially in February of 2003. There are two of them, and then it's tracked down through a series of other transactions and individuals, including the Smith person who was involved with Carter and Pitch, who was the one that Brian is with in Billings when they identify him as being the supplier for Smith. And the exhibit that references that chronology is a stipulation for the admission of the DEA Western Regional Lab results for all of the stuff that was seized all the way through until with Brian's arrest July 23rd in Butte, and it included also the stipulated information on Pitch, Carter, Barker transactions. So that's how we established the knowledge. My question was a little narrower. I wanted to know exactly what Judge Malloy said as to what conduct he was considering in the sentencing. What did Judge Malloy say in sentencing specifically? Well, one thing he said is, Brian, if you ever do this again, you're really going to get hammered. And by the way, don't ever do any more drug transactions because you will be subject to a life enhancement, and Brian didn't do any more drug transactions. He has been incarcerated continuously since July 23rd. So if we look at Judge Malloy's admonition, the context of the sentencing, we had every reason to believe that when we made the deal, it was over. I mean, they had the information. All of the investigations were completed. All of the investigations involved the same conduct, same people, and I have to indicate that Amanda Brothers, the co-defendant in this case, was accused of being a co-conspirator, as was Pitch, as was Tetzlaff in Missoula. Brian didn't have co-conspirators. He had customers, and he fronted dope to them. And that's why none of the conspiracies actually stuck, but I did the Stoddard analysis anyway because it's really apropos to the identity of transactions for purposes of enforcing the plea agreement. Ultimately, I think that under the circumstances of this case, the Court is compelled to set aside the judgment and sentence, both on breach of plea agreement grounds and also on double jeopardy. And I'm not going to take up any more time arguing the issue of the Section 841 enhancement because there were no additional new conduct, nor am I going to argue Lopez because I don't think the panel needs to get to that point to resolve this case. Ginsburg. Can I ask you one question about your 851 validity, the 851 information? I just had a confusion because it seemed that you, in your brief and the government's brief, said that the 851 information that was filed before the Billings trial on March 17th was defective. When we checked the Pacer records, there was a document that was dated, has filed, file stamp from March 17th, which was a complete 851 statement, which had a certificate of service that said it was served by fax to you, I assume. And it wasn't referenced in either brief, so I was quite puzzled by that. Are you referring to Exhibit 4, Your Honor, which shows the handwritten notation of the clerk up on the right-hand side? No, no. May I? Your Honor, I've never seen this document before. I don't know where it came from. It must be something other than what was actually served, because what was actually served was the defective e-filing that has a note, 321, sealed by the court because the number and name are missing in the heading of this document. And that's the one that we say is defective. The document that you have shown me is the one that I have that shows it was filed on 329, but it doesn't have a filing showing a March 17th filing. All I can assume is that the March 17th filing stamp was made to reflect the attempted imperfect e-filing. Is this the custom of the district court in Montana? Would they back data? I don't know why. I don't think it is a custom, but I think that this was we're struggling with the new technology, and I think that there was an effort to accommodate Mr. Vandivering's failed e-mail or electronic filing effort. And to that extent, there may have been an accommodation. But to answer your question directly, no, we don't back date stuff. I wouldn't expect so. Would you – was the defective – because this states, the one that was file stamped states it was faxed to your office. Was the defective one faxed to your office as well? No. And there was a suggestion that it was. But in fact, we confirmed with Assistant U.S. Attorney Vandivering's office that that defective e-mail one was not faxed, and there was no actual service, I don't believe, of the defective one. We certainly acknowledge service of the – what purports to be an amended one. Any further questions? Thank you very much for your attention. May it please the Court. Kelly Varnes representing Amanda Brothers from Billings, Montana. There were two issues that were presented in regard to Amanda's sentencing in this particular case. The first being that we didn't think she should have been charged or held accountable for the purity of the methamphetamine in this case. And then secondly, that she should have received some sort of reduction at sentencing for being a minor or minimal player in this particular case. Upon further reflection, I'll talk about the second issue because I think that probably has a little bit more merit. If I'm wrong, I'm hoping that the three of you will advise me otherwise. I think the District of Montana also had the distinction of being the last district to come on to e-filing. So we've encountered quite a few problems in doing that. Anyway, in this particular case, it was our sense that from the beginning, Amanda Brothers was a minimal player in this case. The problem she made, and it's something that seems to happen with love and women numerous times, is she tried to take the fall for a guy that had a very severe and significant criminal record, and someone who was young enough to be his daughter and those statements stuck with her no matter how incredible they were and no matter how much law enforcement essentially didn't follow those and discounted those. In our particular circumstance, we think the district court got it wrong in two particular ways on the minimal or minor player circumstance. One is, under that particular guideline, I think 3B1.2, the court was required to look at all of the possible players within the cases involving Brian Barker and Amanda Brothers to assess her role. And instead, the court said, well, I'm going to look at the average participant here and make a finding based upon that, and I don't find her involvement to be any less than an average participant. That's the exact language in the guidelines. It is. It's actually less culpable than average participants in the note 3. It is, Your Honor, except that this court has indicated, I think, in Riojas Milano, or if I've got that right, that the language that we are supposed to be focusing on in the review that the court is supposed to be focusing on is how about everybody involved in the transaction that's before the court, whether they're named or not, and was her involvement in all of the people that are before the court a minimal or a minor player. And I think that's the analysis that the case law tells us that we have to follow. Now, I think go ahead. Did you object to the use of the phrase average participant to the district court, or suggest that he wasn't doing what the guidelines required? In my sentencing memorandum, Your Honor, I think I set forth the appropriate standard that the court was supposed to utilize in reviewing that. I don't think right at sentencing that Judge Siebel's language triggered necessarily that mistake right at the time. Mostly, I was so frustrated, Your Honor, that her making two or three fellow telephone calls that Mr. Barker had already done, and then purchasing the bus ticket with money that Brian Barker had given her, I couldn't fathom how that would not make someone a minimal or a minor player. And I think that's where my frustration was more directed. And so at sentencing, I probably didn't challenge the district court in that regard. You're conceding, then, that we look at this for plain error? No, Your Honor, I don't think so, because I made an objection to the pre-sentence report and filed in my sentencing memorandum that she should receive a reduction for being a minor or a minimal player in the case. And so it would appear to me that I've made the record that I need to do there, and then set forth, I think, in my And as I was looking at this yesterday, I think in the Valdez case, it talks about a potentially different standard for a four-point reduction being a minimal player and then maybe a slightly different standard for a two- or three-level departure. I think in the Valdez decision, this Court talks about more of the participant language, and that that might be the focus, where if it's going to be something other than the four-level departure, we would look at the scope of everybody that's before the court. And when I first looked at that, I go, geez, there's two levels here of analysis, and then the more I thought about it, no, they're just trying to say the same thing. I haven't totally resolved that in my mind, but I think as far as this Court's ---- I thought the sentencing guidelines were discretionary. Well, yes, they are, Your Honor, but the first standard we have to reach here in regard to a review of the sentencing is, was the guideline calculation done correctly in the first place? And what I'd have to say here is it's wrong in two counts. One, the Court used the wrong standard, and two, it's just plain wrong on the facts as to whether ---- Tell us exactly what she did. Your Honor, my problem with Amanda is she gave about five different statements. As near as we can distill down, and I think what we have to rely on is the trial testimony that took place with Mr. Barker, because that's all done under oath and is probably the most reliable information, is at Barker's bequest, she made two to three telephone calls to Sheila Pick trying to assist in the transfer of the $10,000 to $16,000 from Billings to Butte. Then while she's in Butte, Montana, at Mr. Barker's request, she goes down to the That's the extent that I've been able to tell Your Honor of her involvement, and I think the trial transcript of the Barker trial verifies that information. What attention should we give to the fact that she apparently was a drug dealer on her own prior to her association with Barker? Your Honor, that's all part of the statement that she first gave when she took the fall and then started stepping back from that long before she was ever charged in federal court. What she was, Your Honor, is she had a state court conviction out of Great Falls for a possession of a very small amount of methamphetamine, a trace amount of methamphetamine, and that was the state court underlying conviction. That she'd been around dealing with drugs from anybody else, I've never seen that appear anywhere in the record except in that early statement when she was trying to take the fall for Brian Barker, which made no sense to me. Your Honor, I see that I'm just about out of time unless the Court had any other questions. I think that addressed the primary issue I thought we ought to look at. We likewise did not think that purity was an appropriate thing here. I struggle with the due process of that. It's not in the indictment. It's not in the plea colloquy. It's not in the offer of proof during the plea, and then it shows up in the precepts report and just strikes me as wrong. But anyway, thank you very much. Thank you. Thank you. Good morning. May it please the Court. My name is Josh Van De Wettering. I'm an assistant United States attorney from Missoula, and I am the AUSA who handled the Barker case below also. And, Judge, to the degree I can clear up the 851 filing, I will try, because it was certainly my error that there was no caption on it. I have learned one thing about ECF is that it files what you give it, and it doesn't tell you you've made that mistake until the clerk calls you later. And I think that's what happened here is the clerk's office brought it to my attention during the trial that I had misfiled this and asked that I file a corrected one. I did send, or had my secretary do it correctly this time, a corrected one. And I don't know whether they lodged things or how they file stamped them. You know, it's just the puzzlement is here is the document, the 851. It's file stamped March 17th, 2006. It's got a certificate of service stating that it was served on opposing counsel, and it's in our PACER record. And you also are not aware of this. Is that correct? I'm not aware of it with that kind of data on it. I know we went back and refiled and re-served. But when you say re-served, did you serve the first time? You know, Mr. Stevens says that they didn't get it, and I cannot tell you, Your Honor, that I honestly did. It was me doing it, and I was in a hurry before trial. I knew that I had filed the 851 months earlier before the mistrial, and I was trying to cover my bases. In retrospect, maybe I should have just left well enough alone, although if I had done it correctly, that would have been a better way to go. But I can't say to you for sure that I served that one right before trial. With respect to Mr. Barker's argument, I think Mr. Stevens and Mr. Barker himself maybe really have it right that, as Mr. Barker said at his first sentencing, he agreed that there was no connection between the Billings operation and the Missoula operation. And he said, to quote him, his involvement in Billings had nothing to do with Thomas Tetzloth. In other words, even in Brian Barker's mind, those are separate operations. Or as Mr. Stevens says, there are no conspiracies. He simply has customers, and he deals with them separately. I alleged that those were conspiracies, those dealing with those different customers. And, of course, we pled one of those away or negotiated one of those away and lost one at trial. So perhaps Mr. Stevens is right. They are not separate conspiracies. They are separate dealings. The point, of course, is that they are separate, whether they're construed as conspiracies or construed as simple sales or possessions with intent to sell. Now, at the time that the plea was taken, in October, everybody knew about the pitch transaction. And certainly Barker knew about it. And it would seem to me that, represented by counsel, they thought that they were dealing to clean out everything, and that he got this one sentence for what he had done up until the time of October. Wouldn't you think that would be the normal thing that someone would think? I wouldn't think so under the terms of this plea agreement, Your Honor. And I think the fact that I cross-examined Mr. Barker at the first sentencing and let me back up a little bit. Everybody knew it was out there in a general sense. I was not the prosecutor personally who charged the Billings case in the first place. That was a colleague of mine who later retired, and then the case was handed over to me sometime after it had been charged. So at the time of Barker's Missoula case, which I was responsible for from the beginning, I was aware that there was Billings stuff out there. And it wasn't that one of the statements that Billings was included in? I included Billings in the indictment in the first place, but I would argue that they still consist of different conspiracies because they involve different people, and as Mr. Barker even acknowledges, separate goings-on. Yes, but this was all his sale to customers. It is undoubtedly, and I certainly won't dispute, certainly from Mr. Barker's perspective, that it's his ongoing crimes. Well, isn't his perspective important here? His perspective is important, Your Honor, but I don't think it's reasonable under the terms of the plea agreement and merely the fact that when Mr. Barker brought the issue up, or Mr. Stevens, I guess, at the first sentencing, trying to sort of cram the Billings stuff into the Missoula conviction, I cross-examined and essentially opposed that idea. He never presented that argument at the time, but I think the fact of my cross-examination at that time certainly should have suggested to Mr. Barker that the government was not agreeing with his assertion at that time that he was out of this idea. And I think the language of the point of putting Billings in the plea agreement. The point of putting Billings in, and certainly something I regret now, I knew Mr. Barker was from Billings, and that was the connection in my mind, was that I knew that he lived in Billings, was coming up to Great Falls and delivering methamphetamine to Mr. Tetzlaff, who was then bringing it over to Missoula. Other than that, there's no connection. But I would even say— But you knew that he was carrying on illegal activities. I knew he was — you say he was from Billings, and then in the plea agreement, you tossed all that in. And certainly when you got to the time of sentencing, Judge — everybody knew it, and Judge Malloy was considering it as part of the sentence. We knew that there was a Billings case out there, Your Honor, but it was always our position, as it is today, that they were separate cases, separate conspiracies, separate crimes, which I think is what it came down to. And the plea agreement itself— Well, I mean, you know, you can diagram those conspiracies in different ways. One conspiracy, two. Same thing, you know. You can diagram them in different ways, Your Honor. You've got an ambiguity over there, and they've got this rule of lenity, and you can see where the guy would figure, well, okay. He didn't want to push his luck, but he did get that in there. What was the sentence on the plea agreement? I don't know off the top of my head, Your Honor. It was around 160 months, but I don't know exactly. Now you've got life. Now we've got life. And I would say this. If we had conceived of it as one conspiracy, I think that would have failed, because we would have had essentially the hub and spoke, but unable to connect the spokes, because they didn't have anything to do with each other. And for that reason, we charged it as separate conspiracies. Well, we had a U.S. attorney from Montana here the other day telling us that it didn't make that much difference anymore, you know. That it didn't make that much difference in the conspiracy? You didn't have to have the spokes anymore. Gosh, I hope that wasn't me. You didn't have to have the rep. I'm sorry. Not the rep. Well, I'll have a talk with him. I think it was her, wasn't it? I don't remember. I think it was her, yeah. Well, I guess all I can say is in this case, I don't think we could have connected those spokes and therefore would have failed in judging an overall conspiracy. If we look at it as just here's Mr. Barker, and he sells drugs to customers. Right. And you pick him up. You finally give him a plea agreement. And that should cover everything that he did up to that point. Since you mentioned billing, since you mentioned all this. Doing it all as one plea agreement would have been a better way to go. There's no doubt about it. And we should have done it that way. You didn't reserve and say we're still going to be able to prosecute you for what you did in the pitch deal. You didn't tell him that at all. We did not say that to him at all, although I think he was understood that we would be doing it. How is that understood? And I would suggest this, Your Honor. It's understood from the plain language of the plea agreement that prohibits only further prosecutions based on the acts giving rise to that Missoula indictment, which the Billings case clearly was not. It should be clear to Mr. Barker. What does it say? Read us the words. I can't find it right now. Read us the words again. The language, Your Honor, is acts and omissions giving rise to the indictment. Well, why doesn't that include some of the sales that were in Billings, as the opposing counsel suggests? Because those sales did not give rise to the first indictment. The first indictment is focused on Ray Tetzlaff and Brian Barker and his activities with that group, including Lloyd Cleland, who I think was in the PSR and gave information about weight, and their sales around Great Falls, Missoula. There's no doubt that Brian Barker came from Billings. And at the time of the indictment, was there knowledge that some of these transactions were happening in Billings, even though an arrest hadn't occurred yet? At the time of the Missoula indictment, there was no knowledge of that. In fact, the Missoula indictment comes down in May 2003, and some of the activities hadn't happened yet. But the package interception happened in June 2003. But that wasn't the ñ this was to get the money. When was the drug delivered? On Billings? That was in June 2003. That was when the package was intercepted. The person it was to be delivered to was Miss Pitts. She cooperated. And they thought they were going to bring the money because they thought ñ But this had been negotiated long before that. Apparently there had been negotiations back in February. No, there had been other deliveries going all the way back to January. I don't think there were ñ I don't ñ I believe that the June delivery that was intercepted was negotiated only a matter of days or weeks before it was actually sent. But, of course, the district court found, with respect to that case, that there was no conspiracy at all. It was just distinct charges of delivery, which I think is a result that enhances the government's argument here, that it's separate activities. And Mr. Barker recognizes that, too. And I think his testimony saying at his first sentencing that that Billings stuff is separate from what I did with Tetzeloff, that's Barker essentially acknowledging that this Missoula plea agreement does not cover that Billings issue. So I don't think it's reasonable for Mr. Stevens to suggest that it is reasonable for Mr. Barker to believe that it's all wrapped up. I think we all knew that it was not all wrapped up, and that's why Mr. Stevens attacked that point. He tried to lay the groundwork for something that wasn't there, and perhaps he should have simply come to the United States and said, let's negotiate the other stuff, too, because I'm worried about it. He was clearly worried about it. We were clearly not agreeing with him that it was all wrapped up. And do you have a site for where that is in the record? That cross-examination that you said indicates the government not agreeing that the Billings pitch transactions were included in the Missoula? I don't have a site for that general cross-examination now. I offer that in response to Mr. Stevens' argument that our cross-examination somehow shows that we were acquiescing in that. And I'm suggesting just the opposite. Is that in the excerpt of the record? I can't – I believe it is, Your Honor, but I wouldn't swear to it without walking back to my table there and taking a look. Would you like me to do that? Well, at the close of the hearing, why don't you give those page sites to the clerk? Okay. You have here in count three that beginning in or about January 2003 and continuing through on or about July the 23rd, 2003, at or near Billings in the State and District of Montana on more than one occasion, Barker did knowingly and lawfully possess with texture over 500 grams of a mixture of substance containing methamphetamine. Now, this is the Billings? And that's the Billings indictment, yes. That's the Billings indictment? Yes, Your Honor. Are you sure? I have it labeled as superseding indictment. Yeah, that's Billings superseding indictment. There were two. The first one didn't have the overlap. Right. And that one, I think, charges just Mr. Barker. The Missoula indictment charges Mr. Barker and Mr. Johnson. Oh, right. I see Billings to be. But you start with January in the. . . And there's an overlap of dates. There's no doubt about it, Your Honor. That's a real troubling thing in my mind, counsel. And I appreciate that, Your Honor. And in that respect, I almost wish I could say I made an error. But the simple fact of the case is that Brian Barker is dealing with Sheila Pitch and her crowd on one hand over here in Billings and selling them drugs. And he's dealing with Raymond Tesloff and Lloyd Cleland and that crowd over here on the other hand. Yeah, but you bring Billings into the. . . And that definitely was a mistake on my part. But even, I would suggest, even if they had negotiated in Billings, it's still two different transactions. He's dealing with two different groups of people who have no connection to one another whatsoever. Brian Barker is on a crime spree. He's a big drug dealer doing a lot of drug dealing. But he's in, I argue, two different conspiracies, but clearly two different sets of customers. And because of that difference, I think he's got no argument on the plea agreement and certainly no argument on the double jeopardy issue. Does the plea agreement use the word Billings? Yeah, it does use the word Billings. Yes. Yeah. It reflects the charges, yeah. Yeah. With respect to Ms. Brothers' sentencing, I don't think you can say that there was error in Judge Siebel's concluding that she's an average participant. He looked at the other people who are participating, some of whom are dealing with drug amounts much lower than the amount that Ms. Brothers was dealing with. She was dealing in a lesser way, certainly lesser than Brian Barker was, and of course he was the leader, but with much higher drug amounts. Her involvement in making phone calls, and I would suggest also, and I'm sorry I don't have this in the excerpts of the record, but I believe it is in the PSR. Ms. Brothers was able to say to the agents what the packaging material was on the intercepted package, and of course she was not there when it was received, and I think that indicates that she at the very least had knowledge of what was in it when it was sent, and that suggests, and she has given a variety of statements, but that certainly suggests that she was in on the sending and isn't involved just in making phone calls to collect money. Do you agree with opposing counsel that the court should be comparing her conduct to other participants in this transaction? I absolutely do, Your Honor. I absolutely do. The judge didn't do that. I would say he did it very quickly. By referring to the use of average and by referring to her as average, I think what he meant was that he had seen the other people, like Tasha Carter, like Sheila Pitch, the people down the line from Sheila Pitch, and considered Ms. Barker to be average in comparison to them and Mr. Barker. But he didn't say that. But he did not say that. That's true. I wish your judges in Montana were a little more precise in sentencing as to what they're up to. He went quickly on that. I certainly don't disagree with that. Unless there are other questions, then, I don't think I have anything else. Thank you. Thank you. Okay. Unless the court has specific questions about the reference to the transfer of permission. All right. Whether or not Ms. Barker is set forth in her brief in the statement. You know, the matter is submitted. We'll recess until 9 a.m. tomorrow morning. Thank you. Thank you.
judges: B. Fletcher, Pregerson, Ikuta